United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ROCHELLE VAUGHN,

        Plaintiff,

  v.

PATRICK R. DONAHOE,

        Defendant.[1]

No. C 09-05746 SI

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On May 13, 2001 and again on June 3, 2011, the Court heard argument on defendant's motion for summary judgment. Having considered the arguments of counsel, the papers submitted, and the parties' supplemental filings, the Court hereby GRANTS defendant's motion.

**BACKGROUND**

Plaintiff Rochelle Vaughn has sued defendant Patrick R. Donahoe, Postmaster General, for disability discrimination, race discrimination, and retaliation. Because this is defendant's motion for summary judgment, the Court discusses the background of the case by viewing the evidence in the light most favorable to plaintiff.

Plaintiff started working for the United States Postal Service in 1987. Decl. of Michael T. Pyle in Support of Def. Mot. for Summ. J. ("Pyle Decl.") (Doc. 58), Ex. A ("Vaughn Depo.") at TR 20:23–21:9. On November 23, 2001, plaintiff was injured on the job. Vaughn Depo. Ex. 5. She was diagnosed with cervical radiculopathy. *Id.* Management at the postal service opposed her workers'

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Postmaster General Patrick R. Donahoe is substituted as defendant for former Postmaster General John E. Potter.

compensation claim, but ultimately the claim was granted on September 26, 2003. *Id.* TR 119:5–119:13 & Ex. 5.[2] Plaintiff had neck pain and was not supposed to lift objects weighing more than 10 pounds. *Id.* TR 17:6–17:10; 31:8. Additionally, she could not perform certain tasks that required her to reach, such as sell stamps and accept packages from customers across a counter. Pyle Decl. Ex. C ("Denton Depo.") at TR 33:20–34:16.

Joseph Tran became plaintiff's supervisor in 2003. *Id.* TR 152:13–152:15. Plaintiff spoke with Mr. Tran about her need for a reasonable accommodation of her physical injury as soon as he became her supervisor. *Id.* TR 152:16–152:19. Among other things, she told him that she could no longer "work the windows" and that she had certain other limitations. *Id.* TR 152:20–152:24. Plaintiff told Mr. Tran "all the time" that she could not handle larger parcels, which was "always an issue" between the two of them. *Id.* TR 153:25–154:6.

In 2004, plaintiff filed an EEO complaint that related to the filling out of forms and her disability. Pl. Oppo. to Def. Mot. for Summ. J. ("Pl. Oppo.") (Doc. 63), Ex. I (excerpt of the deposition testimony of Cecelia Denton), TR 17:3–17:8; Pl. Oppo. Ex. DD (excerpt of the deposition testimony of Rochelle Vaughn), TR 123:14–123:16. As plaintiff recalls it, she filed the complaint because "they were not paying [her] whenever [she] would be off on workers' comp . . . to see doctors . . . . They had [her] in situations where [she] had to be there [and] they kept coding [her] wrongly." *Id.* TR 123:19–124:24. The complaint was resolved at a mediation, during which it was agreed that "Mr. Tran will be trained in the procedures to follow for on-the-job injuries." *Id.* Ex. I, TR 17:16–18:17. Ms. Denton testified at her deposition that both she and Mr. Tran went to a class to be trained on "how to do forms." *Id.* TR 18:14–18:25. But Mr. Tran testified that he was not involved in the mediation, he was never told about that part of the agreement, and he was never told that he needed to be trained. Pl. Oppo. Ex. J (excerpt of the deposition testimony of Joseph Tran). As of the time of her deposition in this case, plaintiff still believed that she had been treated unfairly and that she had not been fully compensated for unpaid wages. *Id.* Ex. DD, TR 125:9–127:23.

---

[2] Although neither party discusses it, defendant has presented evidence that plaintiff also filed a claim for a compensable injury in 1997, which was approved that same year. Decl. of Renita Jones in Support of Def. Mot. for Summary Judgment ("Jones Decl.") (Doc. 56), at ¶ 3.

2

Sometime in 2004 or 2005 plaintiff became a lobby director, greeting customers, helping them fill out their forms, answering questions, and occasionally lifting packages if they were not too heavy or beyond her reach. *Id.* TR 23:1–23:15. Plaintiff did not have any problems working as a lobby director, "except the packages part"—plaintiff's inability to lift certain packages that customers came to pick up. *Id.* TR 157:5–157:14. Sometimes she would get help with the packages, and sometimes she would not. *Id.* TR 154:22–154:25.

Plaintiff had another occasional assignment between 2004 and 2006, and she did not believe that her disabilities were accommodated during that assignment. *Id.* TR 157:15–157:22. Specifically, she was sometimes asked to work in the "accountable cage" at the Pacific Carrier Annex ("PCA"), where clerks are assigned to "accept from the carriers their keys, their scanners, their postage due, [and] their packages of registered mail." *Id.* TR 158:1–159:13; Denton Depo. at TR 14:3–14:15. Plaintiff estimates that she worked at the PCA for seven to ten days before July 2006. Vaughn Depo. at TR 141:23–142:8, 142:22–142:25. She complained to a manager, Cecilia Denton, about the assignment. *Id.* TR 142:9–142:16. She was concerned about job duties such as "casing," where she had to "case repetitiously over [her] head," including sometimes having "to actually climb up on a stool to get to the top." *Id.* TR 142:9–142:23.[3]

On July 2 or July 3, 2006, plaintiff again was assigned to the PCA, where she worked until July 8. *Id.* TR 145:13–145:18. She complained to Mr. Tran that she could not do the work, which involved reaching above her head, climbing up to reach the top of the case, lifting heavy sacks, and "lots of packages, heavy work." Pl. Oppo. Ex. M (excerpt of the deposition testimony of Rochelle Vaughn) at TR 27:12–27:24. No one would stop to help her. Pl. Oppo. Ex. N (excerpt of the deposition testimony of Rochelle Vaughn) at TR 31:11–31:12. She was "hurting and pretty bad," and Mr. Tran "would not acknowledge" her pain. *Id.* TR 31:1–31:2.

On July 12, 2006, with the assistance of Dr. George Karalis, plaintiff wrote a letter to the Office of Workers' Compensation Program ("OWCP") requesting that her orthopaedic claim be expanded to

---

[3] Ms. Denton testified at her deposition that she instructed plaintiff to follow her medical restrictions and specifically told plaintiff that she was not required to lift heavy packages when working at the PCA. Denton Depo. TR 33:2–33:15.

3

include psychiatric illness, because she had psychological issues from the cervical radiculopathy. Vaughn Depo., TR 119:16–120:10 & Ex. 6. She did not return to work after writing this letter. *Id.* TR 120:19–120:22. She did not specifically ask for an accommodation of her psychological injuries. *Id.* TR 159:21–159:24. Plaintiff's workers' compensation claim for a major depressive disorder was accepted on August 20, 2009. *Id.* Ex. 10.

In August 2006 plaintiff contacted the EEO office, and in October 2006 she met with an EEO counselor, to complain that management violated her medical restrictions when Mr. Tran sent her over to work at the PCA. Plaintiff had filled out a formal complaint form in July 2006, which she submitted to the EEO in November 2006 after receiving a right to file letter. Decl. of Johnnie Patterson in Support of Def. Mot. for Summ. J. ("Patterson Decl.") (Doc. 54), ¶ 3 & Ex. A at 4. On January 12, 2007, plaintiff voluntarily withdrew her formal EEO complaint in its entirety. *Id.* Ex. C. At her deposition, plaintiff explained that she "rescinded" her complaint on the advice of Dr. Karalis, "because [she] mentally was not in shape at the time to do it." Vaughn Depo. TR 128:17–128:20, 131:2–131:10.

Starting as early as July 12, 2006, but no later than April 5, 2007, Mr. Tran began to mark plaintiff's absences by entering the code for LWOP, or leave without pay, into the timekeeping system. Tran Depo. TR 78:17–78:24; Denton Depo. Ex. 3. On March 5, 2008, plaintiff received records reflecting a change in her retirement eligibility date. Patterson Decl. Ex. D at 1.[4] She contacted the EEO, and she filed an official complaint on June 27, 2008.

Mr. Tran sent plaintiff a letter on April 30, 2008 regarding her absences. Pl. Oppo. Ex. S. It noted that plaintiff had been "in an AWOL status since April 5, 2007" and that she "may be issued discipline up to an including removal" if she did not "submit acceptable documentation" within five days, consisting of "a statement from your physician regarding the nature of your illness, a statement of inability to perform full or light duty, and duration of absence from work with a return to duty date

---

[4] This citation is to plaintiff's own statement of discrimination claim in her EEO Inquiry Report. There is no copy of the records to which she refers on file. In her opposition brief, plaintiff states that her employment start date was changed from December 5, 1987 to July 11, 1988, and says that the personnel records changing her start date are submitted as Exhibit T. Exhibit T, however, consists only of records adjusting plaintiff's LWOP-coded status to OWCP LWOP-coded status after her psychological workers' compensation claim was approved. It is not clear what records plaintiff intended to include with her opposition papers, whether they are the records of the postal service or of a different government agency, or what the records say.

4

indicated." *Id.*

In December 2008, Mr. Tran signed and sent plaintiff a document with the subject "Notice of Removal." Tran Depo. Ex. 4. The document ("Notice") said that it was "advanced written notice of your removal[] from the US Postal Service" for "FAILURE TO MAINTAIN REGULAR ATTENDANCE/SEPARATION – DISABILITY." *Id.*[5] The Notice stated that plaintiff was to be "remov[ed] from the postal service" no sooner than 30 days from the date on the notice, and it quoted three provisions of the postal service's Employee and Labor Relations Manual ("ELM"): ELM 511.43 Employee Responsibilities; ELM 665.41 Requirement of Regular Attendance; and ELM 365.342 Applicability. *Id.* The Applicability provision of the ELM states:

> a. At the expiration of year of continuous absence without pay, an employee who has been absent because of illness may be separated for disability. This action is not mandatory, however, and if there is reason to believe the employee will recover within a reasonable length of time beyond the 1-year period, the employee may be granted additional leave in 30-day periods, not to exceed 90 days. If the employee's condition indicates that LWOP beyond that period is necessary incident to full recovery, the postal official must submit a comprehensive report to the area manager of Human Resources with appropriate recommendation and retain the employee on the rolls pending a decision.

*Id.* (quoting ELM 365.342).

In December 2008, plaintiff filed a grievance with regard to the Notice. Decl. of Susan B. Valdez in Support of Def. Mot. for Summ. J. ("Valdez Decl.") (Doc. 57), at ¶ 8. On January 23, 2009, she contacted the EEO office regarding the Notice, and she filed a formal complaint on March 9. Patterson Decl. ¶ 5 & Ex. F. According to plaintiff's complaint, she received two right to sue letters in December 2009. First Am. Compl. for Damages ("FAC") (Doc. 51) ¶ 8.

Plaintiff's grievance went through the first and third steps of the grievance process, but not through step two. Valdez Decl. ¶ 9. Because of this procedural error, the postal service rescinded the notice of removal on June 21, 2010. *Id.* ¶ 10 & Ex. A. Plaintiff is not "separated" from the postal service, which means that she still holds her bid assignment—she can request reinstatement to her bid assignment as long as she has medical clearance from her doctor to return to work. *Id.* ¶ 12.

---

[5] In his brief, defendant writes: "Although the document Ms. Vaughn received was apparently interpreted by her to be a Notice of Removal, it is undisputed that Plaintiff was given a Notice of Separation and was never actually separated from service." Pl. Mot. at 7 (Doc. 53). Perhaps it was this subject line or this description that led plaintiff to her interpretation of the letter.

5

After plaintiff's psychological workers' compensation claim was approved towards the end of 2009, Ms. Denton was told that plaintiff's leave status from August 11, 2006 through December 31, 2009 should be coded as "OWCP [Office of Workers' Compensation Program]-Regular" (or "LWOP-OWCP") rather than as LWOP. Jones Decl. ¶ 7. Plaintiff's records indicate that, as of part way through 2011, her absences are almost always being recorded with the OWCP-Regular code, though occasionally they are coded Full Day LWOP instead. Decl. of Carol Croteau in Support of Def. Mot. for Summary Judgment, Exs. A–B. The retroactive recoding of plaintiff's absences impacts her retirement eligibility date, as "credit is allowed towards the employee's years of service for the entire period that an employee receives OWCP benefits if the employee is carried on the Postal Service rolls in LWOP-OWCP status." Crocteau Decl. ¶ 5.

On November 20, 2008, Dr. Karalis faxed a note to Ms. Denton and Mr. Tran that stated that plaintiff "remains totally disabled to & thru 12-28-08." *Id.* Ex. 11. He faxed a second note on December 23, 2008, stating that she "remains totally disabled to and thru 1-21-09." Vaughn Depo. Ex. 12. On December 14, 2009, plaintiff applied for Social Security Disability Insurance, claiming that she had become disabled on July 15, 2006. Vaughn Depo. Ex. 2. Plaintiff testified at her deposition that she told the Social Security Administration that she was "totally disabled and unable to work." *Id.* TR 19:17–19:20. On August 12, 2010, Dr. Karalis faxed a third note to Ms. Denton and Mr. Tran, explaining that plaintiff "remains totally disabled to & thru 10-12-10." *Id.* Ex. 13.

On May 13, 2011, plaintiff obtained an industrial work status report stating that she had "reached Maximal Medical Improvement (permanent and stationary) as of 5/13/2011," and that she can perform certain limited physical activity. Decl. of Shymala T. Rajender in Oppo. to Def. Mot. for Summ. J., Ex. A.[6] On May 25, 2011, she obtained a letter from Dr. Karalis, stating the following:

> I have been treating this patient since 7-12-06 for a U.S. DOL-accepted Major Depression (caused by her job at the USPS).
>
> I have also read [the] 5-13-11 Industrial Work Status Report and I agree that the patient could return to work <u>only</u> providing the USPS assign <u>only</u> duties she can perform without aggravating her injuries.

---

[6] After the initial hearing on this motion, and with the leave of the Court, plaintiff presented this additional evidence, and defendant was provided the opportunity to respond.

6

Psychiatrist's letter (Doc. 71).

**LEGAL STANDARD**

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)).

**DISCUSSION**

Plaintiff filed this lawsuit in December 2009. In the operative complaint, she makes claims for Disability Discrimination in violation of Rehabilitation Act of 1973, Racial Discrimination in violation

of Title VII of the Civil Rights Act of 1964, and Retaliation in violation Title VII of the Civil Rights Act of 1964. FAC at 1. Defendant has moved for summary judgment on all three claims.

### I. Disability Discrimination and the Rehabilitation Act of 1973

Plaintiff's first claim is that defendant discriminated against her because of her disability, in violation of the Rehabilitation Act. To state a prima facie case under the Rehabilitation Act, a plaintiff must demonstrate that (1) she is a person with a disability,[7] (2) who is otherwise qualified for employment, and (3) suffered discrimination because of her disability. *Walton v. U.S. Marshals Serv.*, 492 F.3d 998, 1005 (9th Cir. 2007); *see also* 29 U.S.C. § 791(g) (adopting standards for Americans with Disabilities Act for certain claims under § 501 of the Rehabilitation Act). A person who is otherwise qualified is a person who "is able to meet all of a program's requirements in spite of his handicap." *Se. Cmty. College v. Davis*, 442 U.S. 397, 406 (1979); *see also* 42 U.S.C. § 12111(8) ("The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.").

Both disparate treatment and failure to provide a reasonable accommodation are actionable disability discrimination under the Rehabilitation Act. Section 501 of the Rehabilitation Act, 29 U.S.C. § 791, requires federal agencies to act affirmatively to structure their procedures and programs so as to ensure that handicapped individuals are afforded equal opportunity in both job assignment and promotion. *Buckingham v. United States*, 998 F.2d 735, 739 (9th Cir. 1993). The duty on employers goes beyond mere nondiscrimination. *Id.* Rather, an agency must make reasonable accommodations to the known physical or mental limitations of a qualified handicapped employee unless it can demonstrate that the accommodation would impose an undue hardship on the operation of its program. *Id.* (citing 29 C.F.R. § 1613.704(a)).

---

[7] For purposes of the Rehabilitation Act, an "individual with a disability" is defined with reference to the ADA, as a person (i) with a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) who has a record of such an impairment, or (iii) is regarded as having such an impairment. *See* 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102.

8

### A.   Exhaustion

Defendant first argues that plaintiff may not base her Rehabilitation Act claim on events from July 2006 or earlier, because she did not timely exhaust her administrative remedies.

"To preserve her right to maintain a [Rehabilitation Act] suit alleging employment discrimination against an agency of the United States, a claimant must exhaust her administrative remedies by filing a claim of discrimination with the allegedly offending agency in accordance with published procedures." *Leorna v. U.S. Dep't of State*, 105 F.3d 548, 550 (9th Cir. 1997); *see also Leong v. Potter*, 347 F.3d 1117, 1121–22 (9th Cir. 2003).

> Although failure to file an EEOC complaint is not a complete bar to district court jurisdiction, substantial compliance with the exhaustion requirement is a jurisdictional pre-requisite. The jurisdictional scope of the plaintiff's court action depends on the scope of the EEOC charge and investigation. The specific claims made in district court ordinarily must be presented to the EEOC. However, the district court has jurisdiction over any charges of discrimination that are "like or reasonably related to" the allegations made before the EEOC, as well as charges that are within the scope of an EEOC investigation that reasonably could be expected to grow out of the allegations.

*Leong*, 347 F.3d at 1122 (citations omitted).

Defendant argues that the result of plaintiff's affirmative withdrawal of her 2006 EEO complaint is that the Court does not have the power to hear claims of discrimination occurring in July 2006 or earlier. Plaintiff acknowledges that there might be "particular time-barred actionable events," but she does not concede that any specific portions of her claims are time-barred or unexhausted, and she argues that the potentially-barred portions "form a pattern of regular practice and habit that strongly indicate continued illegal behavior." Pl. Oppo. at 2.

Under the applicable regulations, plaintiff was not only required to initiate contact with an EEO counselor within forty-five days of the date of each alleged discriminatory act[8]; she was also required

---

[8] In *Leorna*, the Ninth Circuit explained the procedures for submitting an employment discrimination claim to an agency as follows:
> Pursuant to the[] procedures [set forth at 29 C.F.R. Part 1614], a claimant must consult the allegedly discriminating agency's EEO counselor prior to filing a complaint in order to try to informally resolve the matter . . . . The claimant must initiate this contact with the counselor within forty-five days of the date of the alleged discriminatory act. If the matter cannot be resolved informally, a complaint must be filed with the agency within fifteen days of the conclusion of the pre-complaint processing. The agency will dismiss a complaint that fails to comply with the applicable time limits or that raises a matter that has not been brought to the attention of a counselor. 105 F.3d at 550–51 (citations

9

to await a final action on her complaint before filing suit. *See Boyd v. U.S. Postal Serv.,* 752 F.2d 410, 413 (9th Cir. 1985) (explaining that the Rehabilitation Act incorporates the requirement of exhaustion of administrative remedies applicable to federal employees under Title VII); *Vinieratos v. U.S. Dep't of Air Force Through Aldridge*, 939 F.2d 762, 768–69 & n.6 (9th Cir. 1991) (explaining that "[o]nly after a final disposition of . . . a formal [Title VII] complaint can the claimant seek judicial review" and that "[f]or this purpose, 'final disposition' means either (a) adoption by the relevant government agency of the EEO counselor's final report, (b) a final decision by the EEOC, if the claimant appeals to the EEOC, or (c) passage of 180 days without receipt of a final decision by either the relevant agency or the EEOC" (citing 29 C.F.R. §§ 1613.217, 1613.281)); 29 CFR § 1614.407. Plaintiff's withdrawal of her 2006 EEO complaint means that there was no final disposition of her complaint, and therefore she cannot rely on that complaint as having exhausted her administrative remedies.[9] The question, then, is whether her 2008 and/or 2009 EEO complaints satisfy the exhaustion requirement with regard to actions taken in July 2006 or earlier.

The Supreme Court has made clear that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *see also id*. at 110 ("A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.' A party, therefore, must file a charge within [the prescribed number of] days of the date of the act or lose the ability to recover for it."); *Cherosky v. Henderson*, 330 F.3d 1243, 1246 (9th Cir. 2003) (explaining that the *Morgan* Court "specifically reject[ed] the application of the continuing violations doctrine to what [could be] characterize[d] as a 'serial violation'"). However, the *Morgan* Court distinguished what is called "pattern-or-practice claims," and reserved ruling on actionability in those cases. 536 U.S. at 123 n.9.[10]

---

omitted).

[9] Plaintiff does not argue that the filing of the complaint constituted substantial compliance with the Rehabilitation Act's exhaustion requirement. Nor does she argue that waiver, estoppel, or equitable tolling applies to excuse her from compliance with the regulations.

[10] The Supreme Court also explicitly held that claims based on a hostile environment "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan*, 536 U.S. at 122.

10

Contrary to plaintiff's suggestion, hers is not a pattern-or-practice claim. Both the Supreme Court and the Ninth Circuit have made clear that "'pattern-or-practice' claims cannot be based on 'sporadic discriminatory acts' but rather must be based on discriminatory conduct that is widespread throughout a company or that is a routine and regular part of the workplace." *Cherosky*, 330 F.3d at 1246–47 (*citing Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977)). Plaintiff neither alleges nor presents evidence of widespread or routine discrimination. *See id.* at 1247. Rather, she challenges "individualized decisions" that "are best characterized as discrete acts, rather than as a pattern or practice of discrimination." *See id.*

Because of this, any attempt by plaintiff to challenge in her 2008 and 2009 EEO complaints actions by her superiors that occurred in 2006—such as assignment to the PCA—was tardy, as it did not occur within the time limits specified by the regulations. Claims based on these 2006 and earlier actions were not exhausted, and plaintiff may not rely on them as forming possible bases for liability in her attempt to defeat defendant's motion for summary judgment on the Rehabilitation Act claim.

### B. Otherwise qualified for employment

Defendant argues that plaintiff may not base any of her Rehabilitation Act claims on actions taken *after* July 2006 either, because by that point plaintiff was completely disabled and therefore not otherwise qualified for employment—the second element of a Rehabilitation Act claim.

A fully disabled person is not otherwise qualified for employment, and therefore she may not bring a discrimination claim or a reasonable accommodation claim under the Rehabilitation Act. *Cf. Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1108 (9th Cir. 2000) (upholding summary judgment of ADA discrimination claim in favor of the defendant where plaintiff was totally disabled); *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1480–82 (9th Cir. 1996) (same, in reasonable accommodation case).

---

*Morgan* was a Title VII race discrimination case. Although plaintiff here brings a hostile work environment claim under Title VII regarding race, she does not attempt to bring one under the Rehabilitation Act, and the Court need not analyze whether such a claim would survive this motion. *See Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005) (reserving the question of whether such a claim could be brought); *Jeseritz v. Potter*, 282 F.3d 542, 547 (8th Cir. 2002) (same); *Slater v. Barnhart*, No. C 00-2469 VRW, 2005 WL 2292376, * 2 (N.D. Cal. July 29, 2005) (same).

11

The burden is on plaintiff, both at trial and on a motion for summary judgment, to establish that she is otherwise qualified for employment. While application for or receipt of Social Security Disability Insurance (SSDI) does not estop or even create a strong presumption against a person's success under the Rehabilitation Act, a "plaintiff cannot simply ignore the apparent contradiction that arises out of [an] earlier SSDI total disability claim. Rather, she must proffer a sufficient explanation." *See Cleveland v. Policy Mgmn. Sys. Corp.*, 526 U.S. 795, 806 (1999) (making this statement regarding an ADA plaintiff).

In her December 2009 SSDI application, plaintiff claimed that she had become disabled on July 15, 2006. Vaughn Depo. Ex. 2. She testified at her deposition that she told the Social Security Administration that she was "totally disabled and unable to work." *Id.* TR 19:17–19:20. Her psychiatrist, Dr. Karalis, informed Ms. Denton and Mr. Tran that plaintiff was "totally disabled" from November 20, 2008 until January 21, 2009; and again from August 12, 2010 through October 12, 2010. *Id.* Exs. 11–13.

Plaintiff does not explain the apparent contradiction between her SSDI application and the doctor's notes on the one hand, and her Rehabilitation Act claim on the other. She just says that she had been able to perform her job adequately before July 2006, and that she did not return to work after receiving the Notice because it said that she would no longer be an employee of the postal service after 30 days. She also presents the May 2011 note from Dr. Karalis stating that she can now return to work under certain conditions. *See* Psychiatrist's letter. But nowhere in his note does Dr. Karalis disavow his previous assessments of plaintiff, and viewed in the light most favorable to plaintiff, this evidence merely indicates that plaintiff is *now* otherwise qualified for employment. Nor does plaintiff explain why, even if she believed that the Notice actually terminated her employment, she did not return to work after the Notice was officially rescinded. Plaintiff's explanation and supplemental evidence is not sufficient to carry her burden to establish the second element of her Rehabilitation Act claim, and therefore defendant is entitled to summary judgment on this claim.

**II.     Racial Discrimination under Title VII of the Civil Rights Act of 1964**

Plaintiff's second claim is for race discrimination under Title VII of the Civil Rights Act. She

bases the claim on both a disparate treatment theory and a hostile workplace theory.

In order to establish a prima facie case of disparate treatment, a plaintiff must show that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for [her] position; (3) [s]he experienced an adverse employment action; and (4) similarly situated individuals outside [her] protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004). Once a plaintiff establishes a prima facie case of discrimination, the employer must offer a legitimate, nondiscriminatory reason for the adverse employment decision. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Collings v. Longview Fibre Co.*, 63 F.3d 828, 833–34 (9th Cir. 1995); *Smith v. Barton*, 914 F.2d 1330, 1340 (9th Cir. 1990). If the employer meets this burden, the plaintiff may produce either direct evidence of discriminatory motive, which need not be substantial, or circumstantial evidence that is "'specific' and 'substantial'" evidence of pretext. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221–22 (9th Cir. 1998).

"To prevail on a hostile workplace claim . . . a plaintiff must show: (1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. City of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003). To determine whether conduct was sufficiently severe or pervasive to warrant liability, courts look at "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (*quoting Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 270–71 (2001)). In addition, "the working environment must both subjectively and objectively be perceived as abusive." *Id.*

### A. Exhaustion

As with the Rehabilitation Act claim, defendant argues that plaintiff failed to exhaust her race discrimination Title VII claim as it relates to actions taken during or before July 2006. With regard to her disparate treatment claim, the Court agrees, for the reasons stated in the section on the Rehabilitation

13

Act. The hostile work environment claim is slightly more complicated, but the Court agrees that plaintiff failed to exhaust this claim as it relates to actions taken during or before July 2006 as well.

The *Morgan* Court explicitly held that claims based on a hostile environment "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Morgan*, 536 U.S. at 122. Plaintiff makes clear that her hostile work environment claim is based on "racial slurs and racially offensive statement[s] made by Tran on several occasions." Pl. Oppo. at 16. Plaintiff testified at her deposition about a variety of such statements. *See, e.g.,* Vaughn Depo. at TR 103:5–108:24. However, all of the statements were made while she was still attending work—in July 2006 or earlier. She does not cite to a single act that would constitute a racially hostile work environment that occurred later than this. Therefore, she would have been required to exhaust her hostile work environment claims long before she filed her 2008 and 2009 EEO complaints.

Plaintiff's Title VII race discrimination claims based on actions taken in July 2006 or before were not exhausted, and plaintiff may not rely on these actions as forming possible bases for liability in her attempt to defeat defendant's motion for summary judgment on the race discrimination claim.

### B.     Disparate treatment claim

Plaintiff's disparate treatment claim relates to assignments that she received while she was still attending work—during or before July 2006. *See* Pl. Oppo. at 5–6 ("Evidence of Discrimination Based on Race"); 16 (explaining that the adverse employment action was "assignments that violated [plaintiff's] medical restrictions"). Her claim was not and no longer can be exhausted administratively, and defendant is entitled to summary judgment.

### C.     Hostile workplace claim

Plaintiff's hostile workplace claim is based on statements and conduct that took place in or before July 2006. Her claim was not and no longer can be exhausted administratively, and defendant is entitled to summary judgment.

### III.     Retaliation under Title VII of the Civil Rights Act of 1964

Plaintiff's final claim is for retaliation in violation of the Title VII of the Civil Rights Act. In retaliation cases, the Court applies the familiar three-step burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The first step requires the plaintiff to make out a prima facie case of retaliation by showing "(1) involvement in protected activity opposing an unlawful employment practice, (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action." *Freitag v. Ayers*, 468 F.3d 528, 541 (9th Cir. 2006). The burden then shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802.  Finally, the burden shifts back to the plaintiff to show that the employer's proffered explanation is merely a pretext for a retaliatory motive. *Id.* at 804. "The causal link may be established by an inference derived from circumstantial evidence, such as the employer's knowledge that the employee engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision." *Jordan v. Clark*, 847 F.2d 1368, 1376 (9th Cir. 1988) (internal quotation marks omitted).

#### A.     Exhaustion

Again, defendant argues that plaintiff failed to exhaust her retaliation Title VII claim as it relates to actions taken during or before July 2006.  The Court agrees.  Plaintiff must prove her case by establishing an adverse employment action taken after July 2006.

#### B.     Protected activity

The parties agree that plaintiff's EEO complaints constituted protected activity within the meaning of Title VII.

#### C.     Adverse employment action

Plaintiff points to several adverse employment actions taken after July 2006: (1) "Ms. Vaughn was terminated by service of the Notice of Separation"; (2) "Ms. Vaughn's supervisors attempted to force her out by sending her warning letters informing her that, despite her doctor's notes, she did not

15

have medical permission to stay away from work"; and (3) "Ms Vaughn's supervisor intentionally altered her retirement entitlement calculations by deliberately mis-coding her time." Pl. Oppo. at 17.

### 1. Termination

Plaintiff argues that she was actually terminated from her employment with the Postal Service, and that this constitutes an adverse employment action. Although termination is an adverse employment action, there is no evidence on the record that would support plaintiff's theory. The Notice could be read to indicate that separation would occur automatically after 30 days if nothing else were to happen. But plaintiff filed a grievance challenging the Notice after only eleven days, and the Notice was rescinded during the grievance process. *See* Valdez Decl. ¶¶ 8, 10. Defendant has presented evidence, in the form of the declaration of a Labor Relations Specialist who has worked for the Postal Service for 32 years, that the rescission of the Notice means that "she was never separated from the USPS" and "she still holds her bid assignment." *Id.* ¶ 12. Plaintiff has presented no evidence to the contrary, arguing only that it was her subjective understanding that she had been terminated. There is no genuine issue of fact, however: objectively, plaintiff was not actually terminated from her employment.[11]

### 2. Warning letters

The record contains evidence of one letter. *See* Pl. Oppo. Ex. S. The text of the letter does not accord with plaintiff's summary that her supervisors "attempted to force her out by sending her warning letters informing her that, despite her doctor's notes, she did not have medical permission to stay away from work." There is no evidence on the record that plaintiff ever submitted documentation to the postal service prior to receiving the letter that included the required "statement of inability to perform full or light duty, and duration of absence from work with a return to duty date indicated." *See* Pl. Oppo. Ex. S. Rather, she had presented a single hand-written claim to the OWCP claim examiner saying simply that she had "psychological issues from the cervical rediculopathy." Vaugh Depo. Ex. 6.

---

[11] Defendant has presented unrebutted evidence that separation (as opposed to removal) is not disciplinary, Pyle Decl. Ex. D (excerpts of the deposition of Adam Alvarez), and plaintiff does not argue that the Notice itself constitutes adverse employment action even if plaintiff was never actually separated and the Notice was rescinded.

16

A disciplinary letter, even if phrased as a warning, can constitute adverse employment action. *See Fonseca v. Sysco Food Servs. of Ariz., Inc.,* 374 F.3d 840, 847 (9th Cir. 2004) (comparing a warning letter to a negative review). However, the letter here was not a disciplinary letter of the sort discussed in *Fonseca*. Rather, it provided plaintiff the opportunity to "submit acceptable documentation" about her disability, and informed her that she could be disciplined if she did not do so. *See* Pl. Oppo. Ex. S. It was a notice. In contrast, the discussion in *Fonseca* was about a plaintiff who, during a grievance process, had a suspension was reduced to what the Ninth Circuit called a "warning letter."

### 3. Deliberate mis-coding of time

The Ninth Circuit has "recognized that an adverse employment action exists where an employer's action negatively affects its employee's compensation." *Fonseca*, 374 F.3d at 847. Under this reasoning, intentional alteration of retirement eligibility by deliberate miscoding of time would constitute an adverse employment decision.

### D. A legitimate, non-retaliatory reason

Defendant argues that even if plaintiff established a prima facie case of retaliation, defendant has successfully rebutted it by articulating legitimate, non-retaliatory reasons for coding plaintiff as LWOP. Defendant argues that Mr. Tran had no choice but to code plaintiff's absences as LWOP before her final worker's compensation claim was accepted, as she had used up her annual leave and sick leave. *See* Tran Depo. at 70:28–70:24. Plaintiff does not present any evidence to the contrary. Defendant has successfully rebutted plaintiff's prima facie retaliation case with regard to the alleged deliberate miscoding, and he is entitled to summary judgment on the retaliation claim as well.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS defendant's motion for summary judgment. (Doc. 53.)

**IT IS SO ORDERED.**

Dated:  June 7, 2011

SUSAN ILLSTON
United States District Judge